IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2002

## STATE OF TENNESSEE v. STEPHEN MASSEY, A/K/A STEPHANIA

**Direct Appeal from the Circuit Court for Giles County**
**No. 8765     Robert L. Jones, Judge**

_____

### No. M2001-02686-CCA-R3-CD - Filed May 30, 2003

_____

The appellant, Stephen Massey, was convicted by a jury in the Giles County Circuit Court of two counts of selling less than .5 grams of crack cocaine, Class C felonies, and three counts of selling .5 grams or more of crack cocaine, Class B felonies. The trial court sentenced the appellant as a Range II multiple offender to an effective sentence of eighteen years incarceration in the Tennessee Department of Correction. On appeal, the appellant contends that (1) the trial court erred in denying the appellant's motion to dismiss on speedy trial grounds, (2) the trial court erred in denying the appellant's motion to sever, (3) the trial court erred in allowing the State to exclude two African-Americans from the jury based on their race, and (4) the sentences imposed by the trial court were excessive. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Stephen Massey.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Mike Bottoms, District Attorney General; and Richard H. Dunavant and Patrick S. Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I.  Factual Background

On December 9, 1998, the Giles County Grand Jury indicted the appellant on two counts of selling less than .5 grams of crack cocaine and three counts of selling .5 grams or more of crack cocaine. These indictments arose from the following series of drug transactions targeting the appellant.

On January 29, 1998, Investigator Brandon Beard with the Giles County Sheriff's Department met with confidential informant, Barry Todd Journey, and arranged for Journey to purchase crack cocaine from the appellant. Investigator Beard provided Journey with thirty dollars ($30) to purchase the crack cocaine and a tape recorder to record the transaction. Journey drove to the appellant's apartment complex at North Third and Washington. Investigator Beard followed, but parked across the street at the SunTrust Bank. He watched as Journey exited his truck and approached the appellant's apartment building.

Journey knocked on the appellant's door and, when an unknown individual answered, asked to see the appellant. The individual replied that the appellant was getting dressed, but that Journey could wait in the living room. After "a couple minutes," the appellant came into the living room. Journey told the appellant that he wanted thirty dollars ($30) worth of cocaine. The appellant reached into "her bra" and pulled out a bag containing "two rocks" of crack cocaine.[1] Journey paid the appellant and left. Investigator Beard followed Journey back to the original meeting place, where he retrieved the tape recorder and the bag containing the "two rocks." Investigator Beard delivered the bag to the TBI crime laboratory for analysis. The analysis revealed that the "two rocks" weighed 0.1 grams and tested positive for cocaine.

On February 5, 1998, Investigator Beard met with Journey and arranged another undercover drug purchase. This time Investigator Beard provided Journey with a tape recorder and forty dollars ($40) to purchase the crack cocaine. He followed Journey to the apartment complex, parked at the bank across the street, and watched as Journey approached the building. This time the appellant answered the door and Journey asked for forty dollars ($40) worth of cocaine. The appellant handed Journey a bag containing "several little rocks." After completing the purchase, Journey met with Investigator Beard and gave him the bag and the tape recorder. TBI analysis revealed that the "rocks" weighed 0.1 grams and tested positive for cocaine.

Following these two transactions, Investigator Beard contacted Special Agent Brad Elliott with the TBI to request his assistance in the investigation. Investigator Beard wanted Special Agent Elliott to go undercover with Journey, who had been purchasing the crack cocaine at "street level," and attempt to make larger purchases. Special Agent Elliott agreed to help and enlisted the aid of Special Agent Charles Rountree. Special Agent Rountree "was to assist with the collecting of evidence by making the tapes and also to provide security."

On February 19, 1998, the TBI agents and Investigator Beard met with Journey. A transmitter was placed on Special Agent Elliott, who was to accompany Journey to the appellant's apartment and attempt to make the purchase. Special Agent Rountree and Investigator Beard monitored the transaction on the receiver.

---

[1] The record indicates that the male appellant had a fondness for women's clothing and often portrayed himself as a woman.

When Special Agent Elliott and Journey arrived, the appellant was standing outside his apartment. The appellant motioned for Special Agent Elliott and Journey to follow him into the apartment. Upon entering, Special Agent Elliott observed that the apartment was vacant. Journey introduced Special Agent Elliott to the appellant, referring to Special Agent Elliott as his cousin "Ed." Special Agent Elliott asked to purchase a quarter ounce of crack cocaine, and the appellant agreed to a price of three hundred dollars ($300).

Special Agent Elliott took a set of digital scales from his pocket and laid them on the table. The appellant then removed a plastic bag containing what appeared to be crack cocaine from his shirt and laid the bag on the scales. Special Agent Elliott agreed that "the weight was about right" and paid the appellant three hundred dollars ($300). After some "brief small talk," Special Agent Elliott took possession of the crack cocaine, put the scales back in his pocket, and left with Journey. They rejoined Special Agent Rountree and Investigator Beard, who advised Special Agent Elliott that they had monitored and made a recording of the transaction. Special Agent Rountree delivered the bag containing the crack cocaine to the TBI crime laboratory for analysis, which analysis revealed that the "rocklike substance" weighed 6.9 grams and tested positive for cocaine.

The final undercover drug transaction occurred on March 5, 1998. Special Agent Elliott, wired with a transmitter, went to the appellant's apartment with Journey. This time Special Agent Elliott was attempting to purchase a half ounce of crack cocaine. When Special Agent Elliott and Journey entered the appellant's apartment, they noticed several unknown individuals "socializing" in the living room. The appellant locked the front door and proceeded to the kitchen. The appellant called an unknown white male into the kitchen. Special Agent Elliott and Journey waited in the living room.

Shortly thereafter, the white male exited the kitchen with what appeared to be "a couple of rocks of crack [cocaine]." The appellant then called "Ed," Special Agent Elliott, into the kitchen. Journey remained in the living room. When Special Agent Elliott entered the kitchen, he observed "a plate which had a cake that looked to be approximately an ounce of crack cocaine in solid form." A single edge safety razor was laying next to the "cake" of crack cocaine.

Special Agent Elliott told the appellant that he wanted to purchase a half ounce of crack cocaine for five hundred fifty dollars ($550). The appellant stated that the price was six hundred dollars ($600) and that he wanted "to check [Special Agent Elliott] for a wire or a weapon." In Special Agent Elliott's waistband, the appellant found the agent's "issue forty caliber weapon." The appellant commented, "That's a police gun." Special Agent Elliott denied that the weapon was a police gun and the appellant said, "Well, okay." Special Agent Elliott then took out his digital scales and the appellant asked for a nickel to check the accuracy of the scales.[2] Special Agent Elliott responded that he did not have a nickel, so the appellant asked another individual, Michael Phillips, to bring him a nickel.

---

[2] Special Agent Elliott testified that "a nickel coin will weigh five grams on accurate scales."

After ensuring that the scales were accurate, the appellant began "cutting chunks off this large cake [of crack cocaine]." The appellant placed "the chunks" on the scales until he had an amount weighing roughly 0.5 ounces. The appellant then placed "the chunks" of crack cocaine into a plastic baggy, which he tied up and handed to Special Agent Elliott. Special Agent Elliott put the baggy into his pocket and paid the appellant. Special Agent Elliott then picked up his scales and started to leave. However, before he exited the apartment, the appellant called Special Agent Elliott back into the kitchen and asked to borrow his scales "to weigh up a quarter ounce that he was going to sell to Michael Phillips." Special Agent Elliott took out his scales and observed the appellant sell a quarter ounce of crack cocaine to Phillips for two hundred fifty dollars ($250).

After collecting his scales, Special Agent Elliott and Journey left the apartment and rejoined Special Agent Rountree and Investigator Beard. Special Agent Elliott briefed the officers on the transaction and placed the crack cocaine in an evidence bag. Special Agent Elliott subsequently delivered the bag to the TBI crime laboratory. Analysis revealed that "the chunks" weighed 12.4 grams and tested positive for cocaine.

The appellant was convicted by a jury of two counts of selling less than .5 grams of crack cocaine and three counts of selling .5 grams or more of crack cocaine. Following a hearing, the trial court sentenced the appellant as a Range II multiple offender to an effective sentence of eighteen years incarceration. On appeal, the appellant contends that (1) the trial court erred in denying the appellant's motion to dismiss on speedy trial grounds, (2) the trial court erred in denying the appellant's motion to sever, (3) the trial court erred in allowing the State to exclude two African-Americans from the jury based on their race, and (4) the sentences imposed by the trial court were excessive.

## II. Analysis
### A. Speedy Trial

Both the Sixth Amendment to the United States Constitution and Article 1, section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial.[3] An identical right is found in Tennessee Code Annotated section 40-14-101 (1997), which provides that "[i]n all criminal prosecutions, the accused is entitled to a speedy trial, and to be heard in person and by counsel." Moreover, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that, "if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, presentment, information or complaint." These guarantees were designed "to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654, 112 S. Ct. 2686, 2692 (1992)).

---

[3] The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Similarly, Article I, section 9 of the Tennessee Constitution provides that "in prosecutions by indictment or presentment [the accused has the right to] a speedy public trial."

In Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2191-92 (1972), the United States Supreme Court established a balancing test to be used by courts in determining whether an accused has been denied his right to a speedy trial. See also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973) (adopting the Barker balancing test in Tennessee). Under the Barker analysis, four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530, 92 S. Ct. at 2192. "This balancing test 'necessarily compels courts to approach speedy trial cases on an ad hoc basis.' If a court determines after applying this balancing test that a defendant has been denied a speedy trial, the remedy is reversal of the conviction and dismissal of the criminal charges." State v. Simmons, 54 S.W.3d 755, 759 (Tenn. 2001) (citations omitted).

The length of the delay "triggers" the speedy trial analysis. Barker, 407 U.S. at 530, 92 S. Ct. at 2192; State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Id. Generally, the delay must approach one year or more in order to trigger the Barker analysis. Simmons, 54 S.W.3d at 759. The indictment charging the appellant with the instant offenses was returned on December 9, 1998. The appellant was not tried until September 10, 2001. Thus, the delay between indictment and trial was just under three years. In State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997), this court concluded that a delay of three years and nine months was not a presumptive speedy trial violation. Moreover, our supreme court has previously concluded that a "total delay of a little over two years is not per se extreme and is not such a length of delay that from this fact alone we would presume prejudice." Bishop, 493 S.W.2d at 85. Accordingly, we must examine the remaining Barker factors.

Generally, the reasons for the delay fall into one of four categories: (1) intentional delay by the State to gain a tactical advantage over the accused or delay designed to harass the accused; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47. "Intentional delay must be weighted heavily against the government, while negligence or oversight are considered against the government but afforded comparatively more neutral weight. Valid reasons, such as the inability to locate a witness, justify an appropriate delay." State v. Easterly, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001) (citing Barker, 407 U.S. at 531, 92 S. Ct. at 2192).

In the instant case, there were numerous reasons for the delay of trial.[4] The appellant was indicted December 9, 1998. On March 4, 1999, while in state custody for violating parole on prior charges, the appellant was served with notice of the indictment. On April 12, 1999, the appellant filed a pro se motion asserting his right to a speedy trial. On May 10, 1999, the appellant was arraigned and Shipp R. Weems, assistant public defender, was appointed to represent the

---

[4] The reasons for delay were gleaned from the record and the appellant's motion to dismiss. At the hearing on the motion to dismiss, the trial court accepted as accurate the facts alleged by the appellant in the motion. Accordingly, where the record did not provide the necessary information, we have relied on these facts.

appellant. However, the appellant was not satisfied with Weems's representation, as evidenced by the appellant's letter to the Giles County Court Clerk dated August 18, 1999, notifying the court that he had filed a complaint against Weems with the Board of Professional Responsibility. Subsequently, on August 23, 1999, the trial court entered an order allowing Weems to withdraw as counsel, but directing the public defender's office to continue to represent the appellant. The jury trial, previously set for September 2, 1999, was continued until March 21, 2000.

On November 15, 1999, R.H. Stovall, Jr., the assistant public defender subsequently appointed to represent the appellant, filed a motion to withdraw as counsel due to a conflict of interest. In his motion, Stovall stated that he had recently become aware that the public defender's office was representing an individual who was likely to be a witness against the appellant at trial. The trial court granted Stovall's motion to withdraw and appointed Tim Underwood to represent the appellant. On March 8, 2000, the State moved for a continuance and the trial court granted the State's motion over the objection of the appellant. Trial was reset for August 2, 2000.

On May 11, 2000, Underwood filed a motion to withdraw as counsel, asserting that "[the appellant] has made it clear his desire to dismiss Timothy P. Underwood thereby creating an inability to work with [the appellant]." Following a hearing on the motion, the trial court allowed Underwood to withdraw and, on June 2, 2000, appointed Hershell D. Koger to represent the appellant.

On July 5, 2000, the appellant, through counsel, filed a motion for continuance, stating that counsel had only recently been appointed, was scheduled to represent another client in a capital murder case during the week of July 17 through July 31, 2000, and, thus, did not have time to adequately prepare for the appellant's trial. The trial court granted the motion and the case was subsequently reset for trial on December 27, 2000. However, on that date the appellant's case was passed and the trial was subsequently reset for September 10, 2001, at which time the appellant did go to trial.

Based on the foregoing, we find no evidence of intentional delay on the part of the State. Although the State did request a continuance which the trial court granted over the appellant's objection, no reason exists in the record, nor did the appellant assert any reason, for the State's request. Accordingly, we are unable to conclude that the State's motion was an effort to gain a tactical advantage over or harass the appellant.

Instead, we find that the majority of the delay was caused by the appellant. By the time his case went to trial, the appellant had been represented by four different attorneys. His first attorney, Ship Weems, was allowed to withdraw from representation after the appellant filed a complaint against him with the Board of Professional Responsibility. Tim Underwood was also allowed to withdraw after the appellant "made it clear his desire to dismiss . . . Underwood thereby creating an inability to work with the [appellant]." In fact, the record reflects that, prior to trial, the appellant filed a complaint against his current counsel, Hershell Koger. Only Assistant Public Defender Stovall withdrew for a reason other than the appellant's inability to cooperate with counsel.

The appellant also contributed to the delay of trial by filing a motion for continuance shortly after the appointment of Koger. Moreover, the appellant filed a motion to sever offenses which, if granted, would have resulted in greater delay. As noted by the trial court,

> [i]f I sever any of these counts, the ones that are severed away are going to be delayed even further. . . . [It would take] two or three years, if we try one at a time. We are only given about eight to ten days a month, that's all we have got, and handle a thousand cases a year.

Accordingly, this factor will be weighed against the appellant.

The third factor to be considered is whether the accused asserted his right to a speedy trial. Barker, 407 U.S. at 531, 92 S. Ct. at 2192; Simmons, 54 S.W.3d at 760. "[A] defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant [was] deprived of that right." Barker, 407 U.S. at 531-32, 92 S. Ct. at 2192-93. On the other hand, "the failure to assert that right will make it difficult for a defendant to prove that he was denied a speedy trial." Id. at 532, 92 S. Ct. at 2193. As previously noted, on April 12, 1999, the appellant filed a pro se "Motion to Dismiss Indictment and/or Fast and Speedy Trial Right for Final Disposition." Thus, the appellant asserted his right to a speedy trial within six weeks of being notified of the charges pending against him. Additionally, on August 26, 2001, counsel for the appellant filed a "Motion to Dismiss Indictment - Speedy Trial Issue," reasserting the appellant's right. This factor weighs in favor of the appellant.

The final and most important factor to be considered is the prejudice suffered by the accused. Barker, 407 U.S. at 532, 92 S. Ct. at 2193; Simmons, 54 S.W.3d at 760. Prejudice is to be assessed in light of the interests of the accused which the right to a speedy trial was designed to protect: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize the anxiety and concern that result from being accused of a crime; and (3) to limit the risk that the defense will be impaired. Simmons, 54 S.W.3d at 760.

In the instant case, the appellant does not claim that he suffered from anxiety and concern or that the delay impaired his ability to prepare a defense We also conclude that the appellant has not demonstrated that he was subject to undue and oppressive incarceration prior to trial. As previously noted, at the time of the indictment, the appellant was in state custody for violating parole on prior charges. Moreover, evidence at the sentencing hearing revealed that the appellant was on parole at the time he committed the instant offenses. Accordingly, the appellant was required to serve any sentence received for the instant offenses consecutive to the one he was serving when indicted. See Tenn. Code Ann. § 40-28-123(a) (Supp. 2002). We conclude that the appellant did not suffer any appreciable prejudice from the delay in trial. This factor does not weigh in favor of the appellant.

After examining and balancing the Barker factors, we conclude that the appellant has failed to establish a speedy trial violation. Although the appellant asserted his right to a speedy trial

early in the case, we find that he contributed substantially to the delay while suffering no appreciable prejudice. The appellant is not entitled to relief on this matter.

### B. Motion to Sever

We review a trial court's determination regarding the severance of offenses for an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). In other words, "a trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice for the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure provides that "[i]f two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." On appeal, the appellant does not argue that the offenses were not part of a common scheme or plan. Instead, the appellant asserts that the evidence of one offense would not be admissible at the trial of the other offenses.

To determine whether the evidence of one offense would be admissible at the trial of the other offenses, we must look to Rule 404(b) of the Tennessee Rules of Evidence. "Evidence of other crimes . . . is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, such evidence may be admissible if the evidence is relevant to a material issue other than character and its probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b)(2)-(3). Tennessee case law has established that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity, absence of accident or mistake, or a common scheme or plan. State v. Hoyt, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995).

The appellant's defense at trial was that he was not selling crack cocaine for profit, but was "providing it for [his] friends." Accordingly, the evidence of each offense was relevant to prove the appellant's intent and its probative value outweighs the danger of unfair prejudice. Because the offenses occurred within a six week period and involved the same confidential informant and basic procedure for purchasing the crack cocaine, the evidence was also relevant to prove common scheme or plan. For these reasons, we conclude that the trial court did not abuse its discretion in refusing to grant the severance. This issue is without merit.

### C. Batson Challenges

Next, the appellant contends that the State used its peremptory challenges to exclude prospective jurors based upon race in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). Specifically, the appellant asserts that "all of the prospective black jurors who made [it to the jury panel] were struck by the State." We note that the trial court excused two prospective African-American jurors for cause. Thereafter, the State exercised its peremptory challenges to exclude African-American jurors Jane Gilbert and David Garrison. The appellant challenges these exclusions on appeal.

A defendant seeking to raise a Batson claim must make a prima facie showing that the State purposefully exercised its peremptory challenge on the basis of race. Batson, 476 U.S. at 93-94, 106 S. Ct. at 1721; Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 902 (Tenn. 1996). To make this prima facie showing, the defendant "must establish that a consideration of all the relevant circumstances raises an inference of purposeful discrimination." Woodson, 916 S.W.2d at 903 (citing Batson, 476 U.S. at 97, 106 S. Ct. at 1723). Once the defendant has established a prima facie case of purposeful discrimination, the burden shifts to the State to articulate a race-neutral explanation for the challenge. Batson, 476 U.S. at 97, 106 S. Ct. at 1723. "This explanation must be based on something more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause." State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992) (citing Batson, 476 U.S. at 97, 106 S. Ct. at 1723). If the State provides a race-neutral explanation, the trial court must then consider all the facts and circumstances to determine whether purposeful discrimination has been established. Woodson, 916 S.W.2d at 903. In making its determination, the trial court must carefully articulate specific reasons for each of these findings on the record. Id. at 906. The trial court's factual findings are imperative in this context and will not be set aside on appeal unless clearly erroneous. Id.

In the instant case, the trial court found that the State's challenge of the prospective jurors was not discriminatory because both of the jurors "ha[d] a kinship with the [appellant]." We agree. During voir dire, prospective juror Gilbert related that she had known the appellant for twenty years, lived in his neighborhood, and considered him to be a friend. Moreover, when asked by the State if she would be uncomfortable finding the appellant guilty, Gilbert responded, "I don't know." The other prospective juror, Garrison, informed the parties that he had known the appellant for over ten years and that his wife was the appellant's "fourth or fifth cousin." The State's peremptory challenge sheet indicated that Garrison also considered the appellant to be a friend. Clearly, the State had race-neutral bases for challenging these jurors. This issue is without merit.

### D. Sentencing

Finally, the appellant contends that the sentences imposed by the trial court were excessive. When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant

on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102 and -103 (1997), -210 (Supp. 2002); see also Ashby, 823 S.W.2d at 168.

The appellant was sentenced as a Range II multiple offender, for which the applicable range for Class B felonies is twelve to twenty years and for Class C felonies is six to ten years. Tenn. Code Ann. § 40-35-112(b)(2)-(3) (1997). The presumptive sentence for both Class B and Class C felonies is the minimum within the applicable range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If the trial court finds that such factors do exist, the court must start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). We note that there is no mathematical formula for valuating factors to calculate the appropriate sentence. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76.

In the present case, the record reflects that the trial court complied with the statutory sentencing principles and procedures. The trial court considered the nature of the offenses, the sentencing principles, the arguments of counsel, the presentence report, and the testimony presented at trial and at sentencing, including the appellant's own testimony. Based upon this information, the trial court applied the following enhancement factors:

> (1) the appellant has a previous history of criminal convictions;
> (8) the appellant has a previous history of unwillingness to comply
> with the conditions of a sentence involving release in the community;
> and
> (13)(B) the felony was committed while the appellant was on parole;

Tenn. Code Ann. § 40-35-114 (1997).[5] The trial court also considered mitigating factor (1), that the appellant's criminal conduct neither caused nor threatened serious bodily injury, Tenn. Code Ann. § 40-35-113(1), but was uncertain that the factor applied, stating, "If that factor has any implication in this case at all, it is being given very limited weight, maybe enough to offset the [appellant's] . . . prior record." The trial court initially sentenced the appellant to sixteen years incarceration for each Class B felony and eight years incarceration for each Class C felony with the sentences to be served concurrently. However, upon further consideration, the trial court concluded that an effective sentence of sixteen years was not "fair" and amended the sentences for the Class B felonies to eighteen years, resulting in an effective sentence of eighteen years incarceration.

On appeal, the appellant contends that the trial court afforded the enhancement factors too much weight. Specifically, the appellant asserts that "it appears that the [trial] court ultimately gave the enhancement factors extra weight based on the fact that consecutive sentencing was not

---

[5] We note that the 2002 amendment to this section added present enhancement factor (1), thereby renumbering former (1)-(22). See Tenn. Code Ann. § 40-35-114, Amendments. However, for the purposes of this opinion, we will use the former designations applicable at the time of the appellant's sentencing.

appropriate in the [appellant's] case." According to the appellant, the trial court enhanced his sentence based upon the "inability" to impose consecutive sentences. The appellant argues, "When sentencing a defendant within a range, the sentence must be based only upon statutory enhancement factors. The inability to sentence consecutively is not a statutory enhancement factor."

After concluding that the appellant did not meet the criteria for consecutive sentencing under Tennessee Code Annotated section 40-35-115(b) (1997), the trial court stated, "I am not satisfied for sure, though, that 16 years is a fair sentence in this case. I am going to amend the Class B felon[ies] to 18 years instead of 16 years and find that [the appellant] will serve all of his sentences concurrently." We do not interpret this language to suggest that, upon determining that consecutive sentencing was inappropriate, the trial court afforded the enhancement factors greater weight. Rather, this language indicates that the trial court did not feel it had properly sentenced the appellant. As previously noted, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the sentencing principles and its findings are adequately supported by the record. Boggs, 932 S.W.2d at 475-76. In the instant case, after determining that an effective sentence of sixteen years was inappropriate, the trial court, as it was free to do, simply afforded the existing enhancement factors greater weight, sentencing the appellant to eighteen years incarceration. This issue is without merit.

### III. Conclusion
Finding no error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE